UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DARREN SONDEY, as personal
representative of the estate of
THOMAS F. SONDEY, deceased,

     Plaintiff,

vs.                                  Case No. 14-13808

CHAD WOLOWIEC,
TODD BENCZKOWSKI,
MICHAEL HUDDAS,
DARRYL BAGIANO, and
THADDEAUS LAMBIRIS,                  HON. AVERN COHN

     Defendants.

_____/

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 56)

### I.     INTRODUCTION

#### A.     The Case

This is a civil rights case under 42 U.S.C. § 1983.  Darren Sondey, on behalf of

the estate of father Thomas Sondey (Sondey), seeks damages for Sondey's death while

in police custody in Warren, MI.  Plaintiff names as defendants 5 police officers in the

Warren Police Department (WPD): Chad Wolowiec (Wolowiec), Todd Benczkowski

(Benczkowski), Michael Huddas (Huddas), Darryl Bagiano (Bagiano), and Thaddeaus

Lambiris (Lambiris).  These officers were variously involved in the arrest and detention

of Sondey in the Warren City Jail from 4:50pm on Monday, September 24, 2012 until

3:34am on Tuesday, September 25, 2012, when he was hospitalized and subsequently

pronounced dead.  During this time period, the plaintiff claims each police officer was

deliberately indifferent to Sondey's serious medical needs. The defendants say in response there is insufficient evidence from which to infer the officers consciously disregarded a substantial risk of serious harm to Sondey.

### B.    Pending Summary Judgment Motion

#### 1.

Defendants have moved for summary judgment, (Doc. 56). In support, they cite the deposition testimony of Wolowiec, Benczkowski and Bagiano, and of non-party police officers working in the jail. Defendants also cite video records from the police car at Sondey's initial arrest and then inside the jail. They cite a variety of records such as police reports, booking documents and time logs. Lastly, the defendants cite the report of the medical examiner who performed an autopsy. Both the plaintiff and defendants cite reports from various medical experts as to the cause of Sondey's death.

Plaintiff has moved for sanctions on the grounds that the defendants have spoliated video records, (Doc. 67). Plaintiff points to time gaps in video footage at critical places and times, saying this indicates editing by the defendants. Defendants say the gaps are the result of camera sensors not detecting motion and that the motion is frivolous. Defendants have filed a cross motion for sanctions on the ground that plaintiff's motion is frivolous, (Doc. 83).

#### 2.

On August 3, 2016, the Court held a hearing on the summary judgment motion and sanctions motions. The Court deferred consideration of the sanctions motions until the end of the case, and heard argument on the summary judgment motion. The Court asked the defendants to provide a complete record, and an accompanying log, of the

2

video and audio of Sondey's initial arrest and then while he was in custody.  The defendants have provided a copy of these records with a corresponding time log.

**3.**

There are genuine issues of material fact as to whether Wolowiec and Benczkowki were deliberately indifferent to the serious medical needs of Sondey, which can only be resolved by trial.  However, summary judgment is appropriate as to the remaining defendants for whom there is insufficient evidence of deliberate indifference. Thus, defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

## II.    BACKGROUND

The facts concerning Sondey's arrest, detention, and death are summarized below, each officer's actions being considered separately.

### A.    Arrest and Trip to Jail

Wolowiec and Benczkowki responded to a 911 call at 4:43pm on a Monday.  The call was generated by a passerby seeing Sondey "slumped" over the steering wheel of a truck parked in the aisle of a parking lot with the motor "running."  The officers arrived at the scene at 4:50.  The Warren Fire Department (WFD), responding to the 911 call, was already there.  The officers approached the truck.  Benczkowki questioned Sondey, whose head leaned on the steering wheel.  Wolowiec and Benczkowki both noticed an "odor of intoxicants."  They said Sondey's speech was slurred and his eyes bloodshot.

Benczkowki asked Sondey if he had "any medical problems."  He mumbled "no."

At the same time, the WFD was checking Sondey's blood sugar and performing a "squeeze test" to see if he was diabetic.  This procedure took 2 minutes.

3

The WFD responder had prescription medications taken from inside the truck. He told the officers: "these pills are from 2010. Vicodin, so. There's only 2 left. But still—3 years old." The WFD run report says no emergency medical services or other aid was administered to Sondey. The WFD left and played no further role.

Benczkowski ordered Sondey out of the truck. Sondey refused. Wolowiec and Benczkowski then hoisted him out of the truck. Sondey fell immediately to the ground. Then, Wolowiec and Benczkowski handcuffed him and searched him by rolling his body over on the ground. Together, the two of them lifted Sondey by both his arms and carried him to their police car.

While Sondey was in the police car, Wolowiec searched the truck. In the passenger seat of the truck, Wolowiec found a bag with an empty orange juice bottle and an open "pint" of vodka that was ¼ full. In addition, Wolowiec found 2 prescription pill bottles, one in a passenger side door for a narcotic "Hydrocodone," with 2 pills left, and one in a center cup holder, with 7 pills left. A halved pill was on the driver's door handle. Both bottles indicated the prescriptions were filled more than 2 years earlier.[1]

While in the police car, Sondey repeatedly cried out the name of his wife, Sophie. Sondey was unable to sit upright and fell to the floor. He continuously asked the officers why he was arrested. Wolowiec responded by telling him it was for operating under the influence of a controlled substance. Wolowiec asked Sondey "what kind of medical problems you got, partner?" Sondey did not answer. Sondey asked to be

---

[1] The pill bottle in the cup holder was labeled for an antibiotic, Amoxicillin. However, as Wolowiec later determined, the inscriptions on the pills reflected the bottle had 6 pills of Tramadol, a pain reliever, and 1 pill of Hydrocodone.

released from the police car.  Wolowiec told Sondey of the pills that were found and asked him if he had used them with alcohol.  He got no answer.

During the drive to the jail, Sondey requested a breathalyzer test, water, and to speak to his wife.  Wolowiec told him his requests could be handled at the jail.  On the way there, Sondey snored briefly between talking to the officers.  When the police car arrived at the jail at 5:21, a third officer from another police car with a detainee said "our guy's about passed out."  Someone then laughed although it is unclear from the video who.  Wolowiec responded "our guy can't hardly walk."

## B.    Booking and Transfer to Jail Cell

Wolowiec and Benczkowki carried Sondey out of the police car into the jail by holding up his arms.  In the jail, Sondey fell face-first in the hallway, with the full weight of his body hitting the floor.  Wolowiec and Benczkowki slid Sondey along the floor by his torso into an elevator.  When the elevator got to the booking area, Huddas helped Wolowiec and Benczkowki carry Sondey out of the elevator by his hands and feet.

While in the booking area tagging evidence, Wolowiec looked up the pills found in Sondey's truck on http://www.drugs.com and identified them as Tramadol and Hydrocodone.  The halved pill found on the driver's door handle was Hydrocodone.

According to drugs.com, Tramadol and Hydrocodone can have lethal side effects when taken with alcohol.  Wolowiec had training in narcotics and alcohol use.  He testified in his deposition that he was aware that the interaction of alcohol and narcotics could cause death.  Benczkowki likewise testified in deposition that he was aware that the interaction of alcohol and prescription pain medications, when taken in improper quantities, could result in death.

5

Wolowiec said in his case report that Sondey was "highly intoxicated, could not walk on his own, kept falling even with officers trying to hold him up." The booking slip, registered by Benczkowski, said Sondey had a "Medical Problem" and "Requires Medication." It also noted Sondey was intoxicated and had "a hard time walking."

Bagiano was the "book officer"[2] at the time Sondey entered the jail. Bagiano was given the booking slip. In his deposition, Bagiano did not recall whether he saw Sondey enter the jail, spoke to Wolowiec or Benczkowski during booking, or knew about the prescription pills found with Sondey.

Sondey's blood alcohol content was tested at the jail by Huddas and another officer. Wolowiec and Benczkowski were informed the level was .149, according to a preliminary breath test. It increased to .16 in roughly 30 minutes based on a breathalyzer test administered by Huddas (the legal limit is .08).[3]

At 6:20, Huddas escorted Sondey to a holding area with other detainees. Sondey walked without assistance. Huddas spoke with Sondey for nearly a minute before closing the door to the holding area. Sondey requested a chemical blood test administered in Lansing, MI based on information read to him from the alcohol tests.

At roughly 6:50, Wolowiec and Benczkowski visited Sondey in the holding area. They denied his request for a chemical blood test. At no time did Sondey ever receive medical attention.

### C.    In the Jail Cell

---

[2] According to Bagiano, the book officer works in the jail control room and handles paperwork, monitors jail video, answers the phone, logs activities of other officers in the jail, and operates the elevators.

[3] Wolowiec and Bagiano testified the WPD's policy requires hospitalization for a blood alcohol content of .35 or higher.

6

The jail log indicates Huddas did "cell checks" of Sondey at 7:14, 8:06, 8:59, 10:03, and 10:56.  At 10:58, the jail video shows Huddas transferring Sondey in a wheelchair to a fingerprinting room.  In the video Sondey looked despondent, as if his condition had worsened.  No reason is given for the wheelchair, and nothing is seen of Sondey talking to Huddas.

At 11:11, Huddas handed Sondey a blanket in the fingerprinting room and wheeled him back to the holding area.  At 11:29, Huddas did another cell check of Sondey.  Nothing further is seen of Huddas.

At midnight, Bagiano transitioned to detention officer.  Lambiris took over as book officer.  Bagiano performed the final cell checks of Sondey—at 12:58am and 2:00am. Bagiano did not "assess" Sondey, but noticed he was "sleeping sitting up" on a bench.

### D.    Medical Event

At 3:05, Lester Jennings-Bush, a detainee, was escorted into the holding area. Although Sondey was initially asleep, Jennings-Bush said in an interview that within "a few minutes" he observed Sondey having a seizure (3:08-09).

Jennings-Bush said he alerted officers by pounding on the holding area window. Jennings-Bush said 3 or 4 officers watched Sondey seize through the window for over a minute, and he heard someone saying "you have to let it play out" and "there is nothing [we] can do."  The video of relevant locations in the jail skips over this time period.

Lambiris was in the control room.  He sent a dispatch call to 911 at 3:10 regarding Sondey, saying "need medical here for inmate having a seizure."

Bagiano entered the holding area at 3:12 and assisted other officers with efforts at resuscitating Sondey until the fire department arrived at 3:19.  Bagiano described

Sondey as "shaking" and seizing during the episode, noting he then turned a blueish color, which is confirmed by video.  Sondey was transported to the hospital at 3:34, arrived at 3:45, and was pronounced dead at 4:09.  A toxicology report revealed the presence of alcohol, hydrocodone, and opiates.

### E.    Autopsy

An autopsy by Dr. Daniel Spitz on the morning of Sondey's death revealed that one of his coronary arteries was 70% narrowed.  The autopsy concluded Sondey died from "natural" causes, namely "Arteriosclerotic and Hypertensive Heart Disease." According to a report from a medical expert for the plaintiff, "[t]he compromising effects of these chronic conditions that are quite common in men [Sondey's] age . . . became lethal when [Sondey] had a seizure caused by the interaction between increasing blood alcohol levels interacting with narcotic pain medicines."  Another expert says a 70% narrowing of the coronary artery, combined with physical attributes of Sondey's cardiovascular system at death, is inconsistent with an acute coronary event.  A report from the defendants' expert opines that Sondey's death "was the result of sudden cardiac death precipitated by longstanding untreated obstructive sleep apnea."

### III.    LEGAL STANDARD

Summary judgment will be granted if the moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must decide "whether the evidence presents a sufficient

8

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  In doing so, the Court "must view the evidence in the light most favorable to the non-moving party." *Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir. 1995).

## IV.   DISCUSSION

### A.   Relevant Law

"Deliberate indifference" by police officers to a prisoner's "serious medical needs" violates the Eighth Amendment's prohibition of cruel and unusual punishment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  An analogous constitutional protection exists for detainees in a jail facility under the Fourteenth Amendment's Due Process Clause. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001).  This extends to the failure to provide needed medical care in some circumstances.  *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010).  To establish a constitutional violation for deliberate indifference, both an objective and subjective component must be met.  *Id.*

Objectively, a detainee must have a medical need "sufficiently serious" that denial of medical care poses "a substantial risk of serious harm" to the detainee. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013).  That is, a condition "so obvious that even a lay person would easily recognize the need for medical treatment." *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013).

Subjectively, a police officer must (1) be aware of facts from which to infer a "substantial risk" of harm without medical care, (2) actually draw the inference of such a risk to the detainee, and (3) act in disregard of this posed risk.  *Quigley*, 707 F.3d

9

at 681.  This needs "a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005).  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

### B.    Analysis

### 1.    Wolowiec and Benczkowki

There is a triable issue of fact regarding whether Sondey, at the time of his interactions with Wolowiec and Benczkowki, had a serious medical need.  Sondey was found slumped over the steering wheel of his truck with an empty pint of liquor and significant narcotics and pain medications nearby, including a halved pill outside the bottle.  Sondey was incoherent, unable to stand or walk, and carried into the jail by 3 police officers.  The pills found all around Sondey, if ingested with alcohol, were capable of causing death.  The circumstances of his arrest suggested he likely ingested a number of the pills, though an exact quantity was unknown.  Sondey's blood alcohol content was on the rise, increasing in a short period.  It is a reasonable conclusion this was enough to alert a lay person of Sondey's need for medical attention.

There is also enough in the facts known to reasonably conclude Wolowiec and Benczkowki perceived a substantial risk of serious harm.  Sondey was arrested for operating under the influence of a controlled substance.  Wolowiec asked Sondey if he had ingested the pills with alcohol.  He received no answer.  Once in the police car, Sondey behaved strangely and called out repeatedly for his wife.  At the jail, Wolowiec researched the pills found with Sondey on a drug website.  The website indicates that

10

the pills were potentially deadly if combined with alcohol.  Wolowiec and Benczkowki were aware of the dangers of combining narcotics, pain medications, and alcohol. Benczkowki marked Sondey as having a "Medical Problem" on his jail booking slip. Wolowiec's case report noted Sondey was "highly intoxicated, could not walk on his own, [and] kept falling even with officers trying to hold him up."

There is a triable issue regarding whether Wolowiec and Benczkowki disregarded the risk posed to Sondey by the combination of pills and alcohol.  The WFD run report reflects that Sondey received no aid or emergency medical services.  The jail to which Sondey was taken had no medical personnel, nor was a medical professional ever consulted.  Moreover, Wolowiec and Benczkowki denied Sondey's request for a chemical blood test once in the holding area.  There is a genuine issue of material fact as to whether Wolowiec and Benczkowki acted in disregard of Sondey's serious medical needs given the gravity of what they saw and no evident effort to seek medical attention on his behalf.

### 2.      Huddas

Little is known about Huddas's subjective knowledge and perceptions because he was not deposed.  Huddas helped carry Sondey out of the elevator into the booking area and observed him for 25 minutes during his breathalyzer test, which produced a reading of .16.  Amid hourly cell checks, and nearly 6 hours after Sondey's initial arrest, Huddas wheeled Sondey out of the holding area in a wheelchair to be fingerprinted.

Construing the evidence in a light favorable to the plaintiff, there is nothing to indicate Huddas knew about the pills found with Sondey.  Moreover, Huddas did not see anything firsthand that would have been inconsistent with alcohol intoxication.  As there

11

is nothing showing that Huddas had reason to perceive or disregard a serious medical need of Sondey, summary judgment is appropriate as to Huddas.

### 3.   Bagiano

Although Bagiano was the book officer at the time Sondey entered the jail, the extent of his knowledge of Sondey's circumstances is unknown.  Bagiano did not recall if he spoke with Wolowiec and Benczkowki or knew about the pills found with Sondey.  Bagiano knew from the booking slip that Sondey was intoxicated and had a "Medical Problem."  He did the final cell checks before Sondey's death.

Jennings-Bush did not specifically name Bagiano as an officer he alerted of Sondey's seizure when it first began.  Because of this, and because Bagiano does not recall key facts such as whether he talked to Wolowiec and Benczkowki about the pills, there is not enough evidence for a reasonable juror to conclude Bagiano disregarded a serious medical need of Sondey.  Summary judgment is appropriate as to Bagiano.

### 4.   Lambiris

Lambiris was not deposed, and it is unclear what communications, if any, he had with Bagiano and others about the facts of Sondey's case or his medical status.  Lambiris called 911 at 3:10am to report Sondey's seizure.  There is no evidence that

12

Lambiris knew about or disregarded a serious medical need of Sondey then or beforehand.  Thus, summary judgment is appropriate as to Lambiris.


<u>s/Avern Cohn</u>
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  August 31, 2016
       Detroit, Michigan